UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MARK MYERS                          )
    *Plaintiff*,                     )
                                    )
    *vs.*                           )      1:09-cv-0544-JMS-DML
                                    )
ROBIN THOMAN, in his individual capacity    )
and in his official capacity as Mayor of the  )
City of Southport, Indiana, and the CITY OF  )
SOUTHPORT, INDIANA                  )
    *Defendants*.                   )

## ORDER

Presently before the Court are Cross-Motions for Summary Judgment, filed by Defendants

Robin Thoman and the City of Southport, Indiana (collectively, "Southport"), [dkt. 21], on the

one hand, and Plaintiff, Mark Myers on the other.  [Dkt. 24.]

### LEGAL STANDARD

A motion for summary judgment asks that the Court find that a trial based on the uncon-

troverted and admissible evidence would – as a matter of law – conclude in the moving party's

favor and is thus unnecessary.  *See* Fed. R. Civ. Pro. 56(c).  When evaluating a motion for sum-

mary judgment, the Court must give the non-moving party the benefit of all reasonable infe-

rences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue

for trial...against the moving party."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986).

Nevertheless, "the Court's favor toward the non-moving party does not extend to drawing infe-

rences that are supported by only speculation or conjecture."  *Singer v. Raemisch*, 593 F.3d 529,

533 (7th Cir. 2010).  The non-moving party must set forth specific facts showing that there is a

material issue for trial and cannot rely upon the mere allegations or denials in the pleadings.

Fed. R. Civ. Pro. 56(e); *Celotex*, 477 U.S. 317.  The key inquiry is the existence of evidence to

support a plaintiff's claims or affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999).

Cross-motions for summary judgment do not automatically mean that all questions of material fact have been resolved. *Franklin v. City of Evanston*, 384 F.3d 838, 842 (7th Cir. 2004). The Court must evaluate each motion independently, making all reasonable inferences in favor of the nonmoving party with respect to each motion. *Id.* at 483.

After having assessed the claims of both parties in accordance with the standard of review for summary judgment, the Court concludes that Southport is entitled to summary judgment. Therefore, in what follows, the Court makes all reasonable factual inferences in favor of Mr. Myers.

## BACKGROUND

Mr. Myers joined the Southport Police Department in 2004 as a patrolman and was promoted to assistant chief of the Department in 2008. [Dkt. 23-1 at ¶ 1.] During January and February 2009, Myers worked exclusively on Thursdays evenings from 4pm-10pm. [Dkt. 23-2 at 69-70.]

Due to budgetary concerns, Robin Thoman, Mayor of Southport ("the Mayor") determined that Southport would have to terminate evening patrols of part-time officers, beginning in March 2009. [*Id.*] Mr. Myers, who only patrolled part-time in the evenings, was therefore no longer assigned any evening patrols after March 1. [Dkt. 23-3 at 71, 74, 82.] Mr. Myers had other duties as assistant chief, such as working at various events, for which he continued to be paid – even after his shifts were cut. [Dkt. 26-1 at ¶ 3.] He received neither a salary nor benefits and was paid an hourly rate. [Dkt. 22 at 16.]

Also due to budgetary concerns, the Mayor decided to install GPS systems in the Department's vehicles, eliminate Department take-home vehicles,[1] implement shift restructuring and shift cuts, and rescind a 3% salary increase that was apparently going to be added to officers' paychecks. [Dkt. 25 at 1.]

Mr. Myers disagreed with many of the policy changes implemented by the Mayor. [Dkt. 23-2 at 32, 44, 48, 53-54, 73; dkt. 23-4.] He approached the then-Chief of Police, Duane Burgess to express his opposition. [Dkt. 23-1 at ¶ 8.] After "failing to receive satisfaction" from Chief Burgess, Mr. Myers began a series of conversations with public officials about the problems he perceived. Mr. Myers was primarily concerned with two issues: "(1) where money collected from doing [vehicle identification number] checks on vehicles should be deposited or allocated; and (2) whether or not the Mayor had the authority to modify a budget set by the Council, and more specifically, whether the Mayor could rescind the 3% raise set by the Council." [Dkt. 23-2 at 45-46; dkt 23-5.]

In late February, Mr. Myers sought out the then-President of the Southport City Council, Greg Dant, to further express his concerns about the Mayor's decisions. [Dkt. 23-2 at 28-29, 50.] On March 2, Mr. Myers called State Board of Accounts member Charlie Pride to reiterate his discontent with the rescission of the 3% pay raise. [Dkt. 25 at 1.] Later that same day, Mr. Myers emailed Mr. Pride restating his concerns. [*Id.*] The following day, Mr. Myers spoke with City Council President Rose Harrison and Council Member Joe Turner about his concerns. [Dkt. 23-2 at 50.]

On March 5, Council Member Susan Schmoll called Mr. Myers to ask him if it was true that the Mayor had rescinded the 3% pay raise. [*Id.* at 50-51.] That day, Mr. Myers sent an

---

[1] The Mayor ultimately rescinded his decision to eliminate take-home vehicles. [Dkt. 23-1 at ¶ 7.]

email to the Mayor asking about the rescission of the 3% raise and reduction in shifts. [Dkt. 23-2 at. at 48.] The Mayor responded to Mr. Myers' email, stating that he had never properly approved the 3% raise and that the reduction in shifts was due to budgetary constraints. [Dkt. 23-1 at ¶ 10.] On March 9, Mr. Myers forwarded the email exchange with the State Board of Accounts to Council Member Schmoll. [Dkt. 23-2 at 55-56; dkt. 23-6.]

Sometime in March, the City's clerk treasurer received a voicemail from the president of the City Council in which the council president made disparaging comments about the Mayor. [Dkt. 23-1 at ¶ 14.] The Mayor learned of the messages, and their content led the Mayor to believe that the council president was referring to the rescission of the 3% pay raise, the shift cuts, and the shift restructuring. [*Id.* at 15.] After discussing the voicemail with Chief Burgess, the Mayor determined that Mr. Myers was the individual who had voiced his concerns to the council members. [*Id.*]

On March 28, Mr. Myers heard that he was going to be terminated for voicing his opinion about the Mayor's decisions. [Dkt. 25 at 2.] In light of this speculation, Myers contacted the Mayor via email requesting an explanation for the Mayor's decision to terminate him. [*Id.* at 4.] In his email response, the Mayor said that he knew that Myers had expressed frustration and disagreement with the Mayor's decisions affecting the Department and that expressing himself outside of the chain-of-command showed "a critical failure of judgment". [Dkt. 23-7.] Further, he said that he had "lost confidence in [Mr. Myers'] ability to support my programs and initiatives." [*Id.*] Later that day, Chief Burgess informed Mr. Myers that he was terminated. [Dkt. 23-1 at ¶ 21; dkt. 26-4 at ¶ 3.]

On March 31, Mr. Myers sent a letter to the Mayor and Chief Burgess requesting a formal disciplinary hearing on the charges against him. [Dkt. 23-8.] A disciplinary hearing was set

for June 11.[2]  [Dkt. 23-9.]  Mr. Myers received a letter that outlined the nature of his charges and

his rights at the hearing, which included the ability to retain counsel, call witnesses, and require

production of documents.  [*Id.*]  The letter stated that Mr. Myers had been charged with violating

Department Policy 3.03.17, 3.03.41, and 1.01.E1.b.  [*Id.*]  The letter also informed Myers that the

"characterization of [Mr. Myers's] current status constituted a suspension without pay," and that

he had only been recommended for termination – not in fact terminated.[3]  [*Id.*]

At the hearing, the Board determined by unanimous vote that in speaking out against the

Mayor's choices, Mr. Myers did not voice matters of public concern – to the contrary, the Board

found that the concerns he raised were disagreements with departmental policy implemented by

the Mayor that affected Mr. Myers in his capacity as a member of the Department.  [Dkt. 23-1 at

¶ 35.]  Therefore, the Board concluded that, in speaking out, Mr. Myers violated Rule 3.03.17,

which provides:

> a) Officers and employees seeking to inquire concerning their duties shall do so
>    through the Chief and may not seek this information from sources outside the
>    Department, except upon permission of the Chief or the failure of the Chief to
>    furnish information in a reasonable length of time, upon which instance or oc-
>    casion they may seek such information from the Board after notifying the
>    Chief of such intent.
> b) Violations of this Rule shall be considered a breach of discipline.

[Dkt. 26-2 at 23; dkt 23-1 at ¶¶ 30, 35.]

---

[2] The hearing was set pursuant to Department Policy # 3.03.04 which permits an officer to re-
quest formal charges and a hearing as a result of a disciplinary action for violating a Department
rule or procedure listed in Department Policy # 3.03.  [Dkt. 26-2 at 10.]  All of the individuals in
attendance had been appointed by the Mayor.  [Dkt. 25 at 6.]

[3] In a written response to the letter, Mr. Myers disagreed with the contention that he had only
been "recommended" for termination and pointed out that he had in fact been terminated on
March 28.  [Dkt. 26-3.]  Mr. Myers also noted that, in his opinion, the unpaid suspension was
nothing more than a sham and a transparent attempt to "avoid the legal consequences of the un-
lawful termination."  [*Id.*]  In a declaration submitted in support of Mr. Myers' opposition brief,
Chief Burgess corroborated Mr. Myers by averring that the Mayor ordered him to terminate
Myers, not merely recommend Myers' termination or discuss an unpaid suspension.  [26-4 at ¶¶
2, 4.]

In light of its finding, the Board demoted Mr. Myers from Assistant Chief to Sergeant, effective June 11. It also noted that Mr. Myers' employment status had been effectively suspended without pay for the time period between March 28 and June 11. [Dkt. 23-10 at ¶¶ 7-8.] Finally, the Board found that Mr. Myers was not entitled to back pay. [*Id*. at ¶ 9.] Mr. Myers did not seek judicial review of the Board's determination. [*Id*. at ¶ 10.]

In late July, Chief Burgess resigned. [Dkt. 23-1 at 94.] Shortly thereafter, the Mayor met with Mr. Myers and asked him if he would agree to work some shifts. [Dkt. 23-2 at 93-94.] Mr. Myers declined, saying he believed that he could not work unless there was a chief-of-police appointed at the time. [*Id*.] The Mayor then asked Mr. Myers to serve as the interim Chief of the Department. [Dkt. 23-2 at 95-97.] Mr. Myers also declined that offer. [*Id*. at 95-99; dkt. 23-13; dkt. 23-14.] Mr. Myers formally resigned on September 28, 2009. [Dkt. 23-2 at 106.]

## DISCUSSION

Mr. Myers initially alleged claims under 42 U.S.C. §1983 from both Mayor Thoman and the City of Southport on the grounds that he was terminated without a predeprivation hearing in violation of the Fourteenth Amendment, and 2) that Southport retaliated against him for voicing a matter of public concern in violation of the First Amendment. [Dkt. 9 at 3.]

Southport argues that Mr. Myers' due process claim, as well as the issues underlying the claim, were already considered and decided by the Board at the June 11, 2009 hearing and were not appealed, so that the doctrines of *res judicata* and *collateral estoppel* preclude Mr. Myers from re-litigating the claim and its corresponding issues in district court. [Dkt. 22 at 12.] Alternatively, Southport argues that Mr. Myers' claims fail on the merits. [*Id.*]

### a) Southport's Arguments Conceded by Mr. Myers

### 1. Dismissal of Claim as Against the Mayor

Mr. Myers' amended complaint names Mayor Thoman as a Defendant "in his individual capacity and in his official capacity" as Mayor. [Dkt. 9.] In section 1983 lawsuits like this one, an "official capacity" suit is "only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dep't of Soc. Serv.*, 436 U.S. 658, 690 n. 55 (1978). As such, Southport argues that the claim against Mayor Thoman in his "official capacity" is no different than the claim against the City. [Dkt. 22 at 25.] Southport further argues that the doctrine of qualified immunity precludes suit against the Mayor. [*Id.*] Mr. Myers does not counter either argument in his response. [Dkt. 25.] The Seventh Circuit has clearly held that a party who fails to respond to points made upon a motion for summary judgment concedes those points. *Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003). The Court thus reasons from his silence that Mr. Myers accepts Southport's argument that his claim against the Mayor in his official capacity is not colorable under the doctrine of sovereign immunity. The Court likewise accepts the argument and holds that Mr. Myers' claim against the Mayor in his official capacity does not survive summary judgment.

### 2. First Amendment Claim

Generally speaking, "In order for a public employee to raise a successful First Amendment claim, he must have spoken in his capacity as a private citizen and not as an employee." *Renken v. Gregory*, 541 F.3d 769, 773 (7th Cir. 2008). The Supreme Court emphasized this as the controlling factor in *Garcetti v. Ceballos*, 547 U.S. 410, 423 (2006). The Court held, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti,* 547 U.S. at 421.

Although Mr. Myers raised a First Amendment claim in his amended complaint, [dkt. 9], he does not respond to Southport's argument that this claim should be dismissed on summary judgment consistent with *Garcetti*, [dkt. 22 at 20-24]. The Court "is entitled to assume that, if [he] had viable arguments…, [he] would have presented them." *Brownstone Publ'g, LLC v. AT&T, Inc.*, 2009 U.S. Dist. LEXIS 25485, *7 (S.D. Ind. 2009) (quotation omitted). Again, the Court interprets Mr. Myers' silence on this issue as an implicit concession that his claim cannot overcome summary judgment. *Palmer*, 327 F.3d at 597-98. Moreover, Mr. Myers' implicit concession is reinforced explicitly by a footnote in his reply brief, [dkt. 25at 11, fn. 4], which states: "In his amended complaint, Myers also claimed that Defendants had violated his First Amendment rights by discharging him. However, the disposition of that claim would not affect or increase his damages under the facts and circumstances of this case." Because of the strength of Southport's position under *Garcetti v. Ceballos,* 547 U.S. 410 (2006), and Mr. Myers' silence in response to the argument, the Court reasons that Mr. Myers' free speech claim fails on a motion for summary judgment.

The Court will turn to Southport's arguments on claim and issue preclusion as well as Mr. Myers' due process claim to the extent it survives those arguments.

**b) Claim and Issue Preclusion**

Section 1738 of Title 28 commands that a federal court give the judgments of a state court "the same full faith and credit . . . as they have by law or usage in the courts of such State . . . ." 28 U.S.C. § 1738. Stated differently, "a state judgment must be given the same res judicata effect in federal court that it would be given in the court of the rendering state." *Hensley v. Jasper Police Dept.*, 163 F. Supp.2d 1006, 1021 (S.D. Ind. 2001). Whether Mr. Myers' claim in this action is barred, therefore, turns upon the preclusive effect of the earlier state judgment under the law of Indiana. *Id.*

Indiana recognizes two doctrines which bar litigation in a subsequent case: (1) claim preclusion, and (2) issue preclusion. Claim preclusion prohibits relitigation of a claim "arising out of the same transaction at issue" in the prior litigation. Issue preclusion "bars relitigation issues that were actually litigated." Id. at 1021-22. *Id.*

In *University of Tennessee v. Elliott*, the Supreme Court held that section 1738 does not apply to unreviewed state administrative decisions to bar subsequent section 1983 claims from federal adjudication. 478 U.S. 788, 794 (1986) (Decision which was rendered in state administrative proceedings and was not reviewed by state courts did not have preclusive effect on university employee's Title VII racial discrimination claims and, thus, did not preclude trial *de novo* on those claims in federal district court.). In other words an unreviewed administrative decision is not claim-preclusive in subsequent section 1983 actions, even when a plaintiff fails to initiate an administrative review action. *Id*. at 792.

However, the *Elliott* court also held that "when a state agency 'acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's fact finding the same preclusive effect to which it would be entitled in the state's courts." 478 U.S. at 788. Thus, when a district court reviews claims that were considered in unreviewed agency decisions, issue preclusion applies, so that the court is bound by the agency's findings. *Id*. at 789.

Although Mr. Stewart is correct to point out that this case is factually similar to *Elliott*, there is a key difference in the states' respective statutory schemes that renders *Elliott* distinguishable with respect to claim – as opposed to issue – preclusion. [Dkt 22 at 13.] In *Elliott*, the statute governing agency review processes – which the plaintiff in that case chose to avoid – was silent as to whether an unappealed agency decision would be final and conclusive if it were left

unappealed. Tenn.Code Ann. § 4-5-101 et seq. (1985). Unlike the laws of Tennessee at that time, however, Indiana law explicitly renders a safety board's decision final and binding if not appealed. Ind.Code § 36-8-3-4(g) ("The decision of the safety board is final and conclusive on all persons not appealing.")[4]

Here Mr. Myers chose not to appeal his case to through the prescribed statutory avenues, without providing an explanation for his failure to do. Because he did not take advantage of the procedural due process afforded him under Indiana state law, his claims are final, binding, and barred from being adjudicated in federal court. However, even if the Considers the merits of the remaining due process claim, it cannot survive Southport's motion for summary judgment.

### c) Myers' Due Process Claim on the Merits

To prove a procedural due process violation, Mr. Myers "must show that the State deprived him of a protected liberty or property interest and that the deprivation occurred without adequate due process." *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 926 (7th Cir. 2007) (citation omitted). Of those two types of deprivations, a loss of public employment potentially implicates only a property deprivation where, as here, the employee does not claim to be blacklisted from future employment. *See Williams v. Seniff*, 342 F.3d 774, 787 (7th Cir. 2003). Before a public employee can claim a property interest in continued employment, however, some "independent source such as state law" must provide the employee with a "legitimate claim or entitlement to it;" the Constitution does not create property interests. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). But if a property interest does exist, the Constitution – not state law – determines the

_____

[4] Under Indiana Code 36-8-3-4(f), an appeal a Board decision *must* be taken by filing in state court, within thirty (30) days after the date the decision is rendered, a verified complaint stating in concise manner the general nature of the charges against the member, the decision of the safety board, and a demand for the relief asserted by the member…. I.C. 36-8-3-4(f) (emphasis added).

minimum procedures that the state must follow before it can deprive a person of that interest. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).

### 1. Property Interest in Continued Employment

A property interest in employment "may be created by express or implied contracts, municipal ordinances or state laws-including those 'rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Thornton v. Barnes*, 890 F.2d 1380,1386 (Ind. 1989). In *Howard v. Incorporated Town of North Judson*, the Indiana Supreme Court held that Indiana Code section 36-8-3-4(c) – the portion of the statute specifically dealing with the right to a hearing before the safety board over proposed disciplinary action – created a property interest in the officer's continued employment. 661 N.E.2d 549, 553 (Ind. 1996). Similarly, Mr. Myers argues that he had a property interest in his employment by virtue of the Department policies which vested in him the right to be discharged only for cause and then only after notice and a hearing before the Board.[5] [Dkt. 25 at 12.]

However, the Seventh Circuit has explicitly said "that no property right existed where a state statute allowed a public employee to be suspended up to fifteen days without a hearing." *Vasquez v. Lake County Sheriff's Department*, 2008 U.S. Dist. LEXIS 96282 *22 (N.D. Ind. 2008). Indiana law is clear that the Chief could suspend Mr. Myers without a hearing and without pay for a certain period of time pending a disciplinary hearing. Ind. Code §36-8-3-4.1(b) provides in pertinent part, "In addition to the disciplinary powers of the safety board, the chief of the department may, without a hearing, reprimand or suspend without pay a member . . . for a

---

[5] Specifically, Mr. Myers argues that Policy #3.03, which provides that a police officer may be disciplined for failure to abide by the Rules of Conduct, and policy #3.03.04, which provides that a police officer charged with a violation of the Rules of Conduct may request a hearing before the Board, created a property interest in Mr. Myers' employment. [Dkt. 25 at 12-13.]

maximum of five (5) working days.  For the purposes of this section, eight (8) hours of paid time constitutes one (1) working day."[6]

Nevertheless, assuming – without deciding – that Mr. Myers can get around the Seventh Circuit authority weighing against him, the Court still has to grant Southport summary judgment.

## 2. Adequate Due Process Remedies

Where, as here, the alleged improper property deprivation arises through a disregard (whether negligently or intentionally) of otherwise valid predeprivation procedures, the "deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (dismissing section 1983 claim against a prison guard alleged to have intentionally destroyed an inmate's property without a hearing).

According to the Seventh Circuit, a meaningful postdeprivation procedure is one that is not "meaningless or nonexistent." *Easter House v. Felder*, 910 F.2d 1387, 1405 (7th Cir. 1990). A postdeprivation procedure can . . . be meaningful even without "all the relief which may have been available…under [section] 1983." *Parratt v. Taylor*, 451 U.S. 527, 544 (1981) (holding postdeprivation procedure meaningful even though it lacked a jury trial right and did not allow for punitive damages).

Mr. Myers contends that he was actually terminated on March 28, not suspended without pay as the later correspondence indicated.  Despite the fact that the Board found otherwise, and assuming it is true, the hearing Myers received before the Board constituted a meaningful post-

---

[6] Moreover, Indiana law establishes that Mr. Myers could be demoted outright from Assistant Chief to Sergeant *without a hearing*.  Ind. Code § 36-5-2-13(m). Ultimately, the Board did demote Myers to sergeant, but only after a full disciplinary hearing.

deprivation procedure. Moreover, the Indiana Code, by providing the opportunity to appeal the Board decision to state court within 30 days, offered Mr. Myers another a postdeprivation procedure. Ind. Code § 36-8-3-4(f). Mr. Myers chose not to take advantage of that procedure and gave no reason for neglecting to do so. [Dkt. 22 at 13.]

Mr. Myers does not challenge the Indiana law itself, but rather, his treatment under the law as it was applied to his case. [Dkt. 25 at 9.] Moreover, Mr. Myers "does not challenge the adequacy of his post-deprivation process in this case." [*Id.* at 11, fn. 5.] As such, his entire due process claim is limited to apply only to the absence of a proper predeprivation hearing. But regardless whether Mr. Myers had a property interest in his employment and regardless whether the predeprivation hearing that deprived him of that interest was, as Mr. Myers claims, simply an attempt by Southport to abdicate itself of liability for wrongful termination [dkt. 25 at 16], adequate postdeprivation remedies were available. In other words, even if Mr. Myers was right to say that his "suspension without pay" was *de facto* "termination," he still would have had – and would have forfeited – the same due process safeguards that are in place to challenge the Board's determination. Mr. Myers chose neither to take advantage of them nor to explain why he could not. Because proper postdeprivation remedies were available to him to remedy any constitutional failings of an improper predeprivation proceeding, Mr. Myers' due process claim cannot overcome summary judgment on the merits.

### CONCLUSION

For the foregoing reasons, this Court **GRANTS** the Motion for Summary Judgment, [dkt. 21] filed by the City of Southport and Robin Thoman in his individual and official capacities, and **DENIES** Mr. Myers' Cross-Motion. [Dkt. 24.] Judgment will issue accordingly.

10/06/2010

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

William R. Groth
FILLENWARTH DENNERLINE GROTH & TOWE LLP
wgroth@fdgtlaborlaw.com

John T L Koenig
BARNES & THORNBURG LLP
jkoenig@btlaw.com